UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
KEVIN JAMEL WALSTON ET AL.,

                Plaintiffs,

           - against -

THE CITY OF NEW YORK ET AL.,

               Defendants.

----------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-04480 (PKC) (RLM)

PAMELA K. CHEN, United States District Judge:

     Plaintiffs Kevin Jamel Walston ("Walston"), Angelica Valentine ("Valentine"), minor child R.W., and minor child P.N. (collectively "Plaintiffs") brought this action against Defendants the City of New York (the "City"), the New York City Police Department ("NYPD"),[1] NYPD Officers David Grieco, Edgardo Carrieri, Joseph Patton, Lisa Miles, and Michael Gessner (collectively "Defendant-Officers"), and John and Jane Doe officers (*i.e.*, the arresting officers of the 75th precinct),[2] seeking damages under Section 1983 for false arrest and malicious prosecution stemming from five separate incidents in 2013. Defendants now move for summary judgment, contending that: (1) there existed probable cause for all five arrests and prosecutions; (2) all

---

[1] Plaintiffs purport to bring this action not only against the City but also against the NYPD. However, the NYPD is a non-suable agency of the City. *Jenkins v. City of New York*, 478 F.3d 76, 93 n. 19 (2d Cir. 2007) (citing N.Y.C. Charter § 396). Accordingly, the Court *sua sponte* dismisses Plaintiffs' claims against the NYPD.

[2] The Court also dismisses *sua sponte* all claims against any still-unnamed John Doe and Jane Doe defendants. For purposes of this order, the Court considers only Plaintiffs' claims against those defendants who were properly served and responded to the complaint. *See, e.g., Acosta v. City of New York*, 11-CV-856 (KBF), 2012 WL 1506954, at *1 n. 1 (S.D.N.Y. Apr. 26, 2012) (dismissing claims against "John Doe" police officers because those defendants were not served and plaintiff did not attempt to ascertain their identities).

Defendant-Officers are entitled to qualified immunity; and (3) all claims against the City should be dismissed because of the lack of any constitutional violations and the lack of any evidence of an official custom or policy that caused the alleged constitutional violations. For the following reasons, the Court finds that Defendants are entitled to summary judgment and that all of Plaintiffs' claims should be dismissed.

## BACKGROUND

I.    **Relevant Facts[3]**

   A.    **Walston's April 10, 2013 Arrest**

On December 1, 2012, non-party NYPD Officer Dillan Krasteff responded to a police dispatch radio call for assistance at the 1000 block of Belmont Avenue in Brooklyn. (Defendants' 56.1 Statement ("Defs. 56.1"), at ¶ 4.) When Officer Krasteff arrived at the location, he encountered Robert Davilla, who stated that a woman, identified as V.N., had climbed through his window seeking help. (*Id.* at ¶ 5.) She was bleeding and in shock. (*Id.*) Officer Krasteff met with V.N. in Davilla's home. (*Id.* at ¶ 6.) V.N. told Officer Krasteff that while she was walking to the corner store to buy cigarettes, she was confronted by a man known as "Mellow," who told her that she "got Reggie locked up." (*Id.* at ¶ 7.) Mellow then pulled her into an apartment on the second floor of 1029 Belmont Avenue, beat her, and tried to rape her. (*Id.*) V.N. also stated that Mellow released two dogs on her that mauled her. (*Id.*) V.N. explained that she escaped by jumping off the second-floor balcony. (*Id.*) Officer Krasteff observed that V.N. was covered in blood and had visible bites on her body, lacerations to her legs and arms, a swollen face, and a cut around her

---

[3] Unless otherwise noted, a standalone citation to Defendants' 56.1 Statement (Dkt. 41-1) denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to Defendants' 56.1 Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

eyes. (*Id.* at ¶ 8.) V.N. was admitted to Brookdale Hospital, where she received fifty stitches and was treated for a broken ankle. (*Id.* at ¶ 11.) Officer Krasteff prepared a complaint report. (*Id.* at ¶ 10.)

NYPD Detective ("Det.") Joseph Patton investigated the incident and interviewed V.N. at the hospital on December 10, 2012. (*Id.* at ¶ 13.) V.N. gave the same account to Det. Patton as she had given to Officer Krasteff. She added that when Mellow released his dogs on her, he told them to "kill the bitch." (*Id.*) She identified Walston a/k/a "Mellow Yellow" as her assailant. (*Id.* at ¶ 14.) Det. Patton went to Walston's various known addresses "a number of times" to look for Walston, but was unable to locate him. (*Id.* at ¶ 16.) On March 28, 2013, the victim identified Walston in a photograph, confirming he was her attacker. (*Id.* at ¶ 18.) On March 29, 2013, the police department issued an I-Card for Walston, which signaled that he was wanted as a suspect or witness for questioning. (*Id.* at ¶ 19.) On April 10, 2013, officers from the Brooklyn North Warrant Squad brought Walston to the 75th Precinct. (*Id.* at ¶ 20.) Det. Patton arrested Walston for assault in violation of Penal Law §§ 120.05(1) and 120.05(1X), and swore out a criminal court complaint based on the statements made to him by V.N. (*Id.* at ¶¶ 20, 22.) The charges against Walston were ultimately dropped under the speedy trial provisions because the prosecutor could not locate the victim. (Defs. 56.1, at ¶¶ 23-24.)

### B.     Walston's May 25, 2013 Arrest

On May 25, 2013, non-party NYPD Det. Radoslaw Terepka received a telephone call from a tipster advising Det. Terepka that the tipster had information about an illegal gun. (Defs. 56.1, at ¶ 25.) Det. Terepka and Defendant Officer Grieco went to meet the tipster that same day. (*Id.*) The tipster informed them that an individual by the name of "Mellow" had a gun in the basement

of 1029 Belmont Avenue in Brooklyn.[4]  (*Id.*)  Det. Terepka stated that he knew from his experience in the 75th precinct that "Mellow" was Walston, who at the time was living at 1029 Belmont Avenue.  (*Id.*)  Det. Terepka communicated this information to the other police officers on his team.  (*Id.* at ¶ 26.)

In the early morning hours of May 25, 2013, Det. Terepka received a phone call from one of his fellow officers that he had recently seen Walston exiting the basement of 1029 Belmont Avenue.  (*Id.* at ¶ 27.)  Det. Terepka and Officer Grieco went to 1029 Belmont Avenue and spoke with non-party NYPD Officer Greg Minardi, who said that he had seen Walston leaving the building.  (Deposition of David Grieco ("Grieco Dep."), Dkt. 41-7, at 109:10-110:7.)  A police officer entered the basement at 1029 Belmont Avenue and recovered an unloaded revolver wrapped in a sock.  (Defs. 56.1, at ¶ 29.)  Officer Grieco arrested Walston for criminal possession of a firearm in violation of Penal Law § 265.02(1).  (Defs. 56.1, at ¶¶ 30-31.)  Officer Grieco signed the criminal court complaint.  (*Id.* at ¶ 33.)  The District Attorney ultimately dismissed the case on May 31, 2013.  (*Id.* at ¶ 34.)

### C.    Plaintiffs' July 9, 2013 Arrest

On July 4, 2013, a NYPD officer was shot in East New York.  (*Id.* at ¶ 35.)  Brooklyn North Homicide received an anonymous tip that the shooter was hiding inside 1029 Belmont Avenue.  (*Id.*)  M.M., the owner of 1029 Belmont Avenue, provided the NYPD with written permission to enter and search the building.  (*Id.* at ¶ 36.)  M.M. advised the police that no one was supposed to be living in any of the apartments.  (*Id.*)  On July 9, 2013, Emergency Service Unit ("ESU") officers went to 1029 Belmont Avenue to search the building.  (Deposition of

---

[4] 1029 Belmont Avenue is a two-story building containing four rental apartments.  (Defs. 56.1, at ¶ 1.)

Angelica Valentine ("Valentine Dep."), Dkt. 41-9, at 39:9-20.) The ESU found Plaintiffs Walston, Valentine, and their two children, living in one of the apartments. (*Id*.) Defendant Officer Carrieri was informed by his fellow NYPD officers that M.M. had informed them that no one was supposed to be living in the building. (Deposition of Edgardo Carrieri ("Carrieri Dep."), Dkt. 41-8, at 53:5-13, 60:18-61:12.) Upon discovering Plaintiffs' and their children in the apartment, Officer Carrieri's partner, Sargent Diego Dotres, called M.M. to confirm that Plaintiffs were not supposed to be living at the premises, which M.M. confirmed. (*Id.*) Officer Carrieri did not recall whether he asked Walston or his family if they had a lease for the apartment. (*Id.* at 49:17-50:16.) He arrested Plaintiffs for trespass in violation of Penal Law § 140.15(2), and signed a criminal court complaint. (Defs. 56.1, at ¶¶ 47, 56.) M.M. also signed a supporting deposition to accompany the criminal court complaint. (*Id.* at ¶ 57.)

Officer Carrieri never saw Walston's children at 1029 Belmont Avenue or at the precinct after the arrest. (*Id.* at ¶ 42.) According to Valentine, an unknown officer placed her children in a cell for about an hour before they were picked up by a relative. (*Id.* at ¶ 41.) Valentine admitted that neither her daughter, who was less than a year old, nor her son, who was three years old, had any understanding of what was going on. (*Id.* at ¶¶ 43-44.) At their arraignment, Plaintiffs learned for the first time that they were being charged with trespass. (*Id.* at ¶ 58.) They ultimately produced a lease for an apartment at 1029 Belmont Avenue and the charges against them were formally dismissed eight months later, on March 20, 2014. (*Id.* at ¶¶ 58-60.)

### D. Walston's December 28, 2013 Arrest (First)

On December 28, 2013 at 2:13 am, a police dispatcher reported over the radio that a 911 call had come in about a grey van driven by a woman. The dispatcher stated that a black male passenger pulled another woman into the van, strangled her, and punched her in the face.

(Deposition of Lisa Miles, ("Miles Dep."), Dkt. 44-13, at 19:2-16, 34:9-18.) The incident occurred near the intersection of Fulton Street and Logan Street. (Defs. 56.1, at ¶ 61.) At 2:20 am, a second caller reported an emergency at nearby 1029 Belmont Avenue. (*Id.* at ¶ 62.) Defendant Officer Miles heard the radio reports, and went to 1029 Belmont. (*Id.* at ¶ 63.) When Officer Miles arrived, she saw a grey SUV with a female driver, a female passenger, a black male passenger, and a child inside. (*Id.* at ¶ 64.) One of the women, S.H., was screaming that she had called the police because the male in the vehicle (Walston) had been strangling her cousin (Valentine), the other adult female. (*Id.*) Valentine had injuries to her face that were consistent with the dispatch radio report. (*Id.* at ¶¶ 67, 69.) Officer Miles spoke to Valentine, who claimed that "a group of girls" had tried to assault her at another location. (Miles Dep., at 24:9-25:4.) Officer Miles concluded that Valentine's observable injuries were consistent with what the complaining witness told her at the scene, *i.e.*, that Walston had assaulted Valentine. (*Id.* at 37:7-14, 70:4-8)

Based on this information, Officer Miles arrested Walston for criminal obstruction of breathing (*i.e.*, choking), assault, and harassment in violation of Penal Law §§ 121.11, 120.00(1) and 240.26(1). (Defs. 56.1, at ¶¶ 68-70.) Officer Miles signed the criminal court complaint. (*Id.* at ¶ 75.) Officer Miles filled out the criminal court complaint incorrectly by stating that Valentine had told the Officer that Walston had hit and choked her. (*Id.* at ¶ 76.) Instead, the complaint should have stated that the witness S.H. provided this information to Officer Miles. (*Id.*) The charges against Walston were dismissed on speedy trial grounds. (*Id.* at ¶ 77.)

### E. Walston's December 28, 2013 Arrest (Second)

While Walston was in the 75th precinct in connection with his arrest by Officer Miles, the police realized that there was an open complaint report against Walton stemming from an incident on December 13, 2013. (*Id.* at ¶ 80.) Non-party NYPD Officer Ramil Casimir had recorded in

the complaint that S.A., the owner of a local gas station bodega, alleged that he had been threatened with a "firearm" by Walston. (Compl. Rep. of 12/13/13, Dkt. 41-41.)

Defendant Officer Gessner investigated the open complaint report. (Defs. 56.1, at ¶ 80.) Officer Gessner went to the gas station to interview S.A. and confirm the information in the report.[5] (*Id.* at ¶ 81.) S.A. identified Walston and told Officer Gessner that Walston often came into the store and took merchandise. S.A. confronted Walston about his shoplifting on December 13, 2013 and Walston responded by threatening S.A. with a firearm. (*Id.* at ¶ 82.) S.A. viewed a photograph of Walston shown to him by Officer Gessner, and confirmed that Walston was the person who had brandished a gun at him on December 13, 2013. S.A. signed his name to the photo. (*Id.* at ¶ 83). Officer Gessner then returned to the precinct and arrested Walston for menacing under Penal Law § 120.14(1). (*Id.* at ¶ 85.) Both Officer Gessner and S.A. spoke to the District Attorney's office. (*Id.* at ¶ 86.) When Officer Gessner spoke to the Assistant District Attorney, Officer Gessner advised that there was video surveillance of the incident, but that he had not attempted to view or recover it. (*Id.* at ¶ 84.) S.A. did not sign an affidavit to accompany the criminal complaint. The District Attorney's office dismissed the charges on January 3, 2014 because the victim did not cooperate with the prosecution. (*Id.* at ¶ 90.)

## II. Procedural History

Plaintiffs filed the initial complaint in this action on July 31, 2015 alleging a violation of their rights under Section 1983. (Dkt. 1.) Plaintiffs amended their complaint on September 3,

---

[5] The prior complaint states that the perpetrator was "known" to the victim. (Compl. of 12/13/13, Dkt. 41-41, at 1-2.) In response to the question whether the perpetrator "can be identified" the complaint reads "yes." (*Id.*) The complaint includes Walston's full name and nickname as the perpetrator. (*Id.*) Similarly, the complaint room screening sheet from 12/28/13 reads that S.A. and Walston "are acquaintances" and that Walston is a "frequent customer" of S.A.'s grocery store. (Compl. Rep. of 12/28/13, Dkt, 41-50.)

2015.  (Dkt. 4.)  Defendants answered the Amended Complaint on November 5, 2015.  (Dkt. 10.)

Plaintffs filed a second amended complaint on January 21, 2016.  (Dkt. 13.)  Defendants answered

the Second Amended Complaint on May 10, 2016.  (Dkt. 18.)  Defendants' motion for summary

judgment was fully briefed on June 9, 2017.  (Dkts. 41, 42, 45.)

## SUMMARY JUDGMENT STANDARD OF REVIEW

"Summary judgment is appropriate where there are no genuine disputes concerning any

material facts, and where the moving party is entitled to judgment as a matter of law."  *Summa v.

Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013) (quoting *Weinstein v. Albright*, 261 F.3d 127, 132

(2d Cir. 2001)); *see also* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "Material" facts are facts that "might

affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A "genuine"

dispute exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id.*  "The moving party bears the burden of establishing the absence of any

genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d

Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 322).  Once a defendant has met his initial burden,

the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex

Corp.*, 477 U.S. at 324 (internal quotation marks omitted). In determining whether there are

genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible

factual inferences in favor of the party against whom summary judgment is sought." *Terry v.

Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and internal quotation marks omitted).

The court's inquiry upon summary judgment is "determining whether there is the need for

a trial—whether, in other words, there are any genuine factual issues that properly can be resolved

only by a finder of fact because they may reasonably be resolved in favor of either party."

*Anderson*, 477 U.S. at 250. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

### I.     Legal Standards

#### A.      False Arrest under Section 1983

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). Under New York law, to prove the elements of false arrest, a plaintiff must establish that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Because probable cause confers authority to confine a suspect, probable cause is a complete defense to a claim of false arrest. *Williams v. Town of Greenburgh*, 535 F.3d 71, 78–79 (2d Cir. 2008). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins v. City of New York*, 478 F.3d 76, 84-85 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852); *see also Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (an officer has probable cause when he or she has "reasonably trustworthy information as to [ ] facts and circumstances that are sufficient to warrant a person of reasonable caution in the

belief that an offense has been . . . committed by the person to be arrested"); *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense'") (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (alteration in original)). The determination of "whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest[.]" *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996) (probable cause determination focuses on officer's knowledge at time of arrest).

### B. Malicious Prosecution under Section 1983

To demonstrate a malicious prosecution claim under Section 1983, a plaintiff must show "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003). In addition, a plaintiff must allege a "post-arraignment deprivation of liberty that rises to the level of a constitutional violation" under the Fourth Amendment. *Singer*, 63 F.3d at 117. Commencement or continuation of a criminal proceeding includes swearing out a complaint or other "accusatory instrument." *Rounseville v. Zahl*, 13 F.3d 625, 628 (2d Cir. 1994). The termination of a proceeding in a plaintiff's favor includes formal abandonment of the prosecution. *Id.* at 629. Probable cause is also a complete defense to claims of malicious prosecution. *Savino*, 331 F.3d at 72. Once probable cause to arrest has been established, claims of malicious prosecution survive only if, between the arrest and the initiation of the prosecution, "the groundless nature of the charges [is] made apparent by the discovery of some intervening fact." *Lowth*, 82 F.3d at 571. Malice requires a showing by the plaintiff that the defendant had "a wrong or improper motive, something other than a desire to see the ends of justice served." *Id.*

## II.     Analysis

### A.     Walston's April 10, 2013 Arrest

#### 1.     False Arrest Claim – April 10, 2013

Walston argues that he was falsely arrested and maliciously prosecuted on April 10, 2013, because Defendants did not have probable cause to arrest or prosecute him.  Regarding false arrest, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quotation omitted); *Miloslavsky v. AES Eng'g Soc'y*, 808 F.Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir.1993) ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed."); *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) ("[A] positive photo identification by an eyewitness is normally sufficient to establish probable cause").  Thus, an officer is entitled to rely on a victim-witness's complaint to establish probable cause, unless the officer has reason to doubt the veracity or reliability of the witness's information.  *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (noting that probable cause may not exist if there are doubts as to the witnesses' veracity); *Celestin*, 581 F. Supp. 2d at 431 (noting that probable cause might not be established by victim's or eyewitness's identification where the identification procedure is "too unreliable to establish probable cause").

Here, Det. Patton correctly determined that there was probable cause to arrest based on Officer Krasteff's complaint report and V.N.'s account of the attack. V.N. reported the attack right after it occurred and in vivid detail, including how Walston beat her and released his dogs on her. (Affidavit of Dillan Krasteff ("Krasteff Aff."), Dkt. 41-3, at ¶ 8-11.)  Officer Krasteff observed dog bites, lacerations, and other injuries on V.N. that were consistent with her account.  (*Id*. at ¶ 9.)  V.N. also received fifty stitches and treatment for a broken ankle at the hospital immediately

after the alleged incident. (Defs. 56.1, at ¶ 11.) In addition, Walston was no stranger to V.N., who told Officer Krasteff that she knew Walston by the nicknames "Mellow" and "Mellow Yellow," and identified him as her assailant. (Deposition of Joseph Patton ("Patton Dep."), Dkt. 41-12, at 32:25-33:7, 35:10-19, 77:24-78:4.) Under these circumstances, there was no reason for Officer Krasteff or Det. Patton to doubt the veracity or accuracy of V.N.'s account of December 1, 2012 incident or her identification of Walston as the perpetrator. Therefore, Det. Patton was entitled to rely on the information provided by V.N., as corroborated by the physical evidence, as establishing probable cause to arrest Walston for the December 1, 2012 incident.

Walston argues that this evidence was insufficient because V.N. did not sign a sworn deposition. The Court disagrees. The mere fact that V.N. did not sign a deposition does not undermine her credibility or the reliability of her statements to the officers, which were bolstered by the unmistakable signs of injury she bore—dog bites, lacerations, and a broken ankle (which required medical treatment)—as well as the report of the civilian witness, Davilla, into whose window V.N. climbed to escape her attacker.

Walston further argues that there was no probable cause because V.N. confirmed Walston's identity through a single photo. (Pl. Br., Dkt. 42, at 23-24.) In cases where a single photograph is shown to a victim to identify a person responsible for a crime, the Court must first decide whether the identification procedure unduly and unnecessarily suggested that the defendant was the perpetrator. *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). If so, the Court must determine whether the "identification was nonetheless independently reliable." *Id.*[6] With this standard in

---

[6] The reliability of an identification is determined by examining the totality of the circumstances under which the identification was made. Generally, courts look to several factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty

mind, the Court finds that the single photograph was not unduly suggestive. As stated above, V.N. identified Walston as her attacker immediately after the incident and claimed that she knew him previously. When she identified him in the photograph she was merely confirming for police that he was the perpetrator, *i.e.*, the man she knew as "Mellow" or "Mellow Yellow." Walston casts no doubt on the validity of the identification, which was sufficient to establish probable cause.

Furthermore, even if the single-photo identification was unduly suggestive, V.N.'s identification was independently reliable. V.N. told the police that the attack was personal, *i.e.*, that it was in response for "getting Reggie locked up." (Defs. 56.1, at ¶ 7.) She also identified Walston's residence—1029 Belmont Avenue—as the site of the attack. (*Id.*) According to both Officer Krasteff and Det. Patton, V.N. immediately and without hesitation identified Walston in as the perpetrator. She also offered the same, consistent account to both police officers. Accordingly, even assuming that the use of a single photograph was unduly suggestive, the Court finds that V.N.'s identification of Walston as her attacker was independently reliable and thus sufficient to establish probable cause to arrest Walston on April 10, 2013. *See United States v. Curley*, 08-CR-404, 2008 WL 11378859, at *7 (S.D.N.Y. Dec. 22, 2008) (holding single photo identification reliable where witness had a "clear and lengthy opportunity" to "interact and converse with" defendant).

### 2. Malicious Prosecution Claim – April 10, 2013

Walston's malicious prosecution claim is similarly without merit. If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined "by the discovery of some intervening fact." *Kinzer*, 316 F.3d at 44 (internal quotation marks omitted).

---

demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Regarding this claim, Walston simply repeats his challenges to the probable cause underlying Walston's arrest – arguments rejected above – and complain about law enforcement's inability to proceed with the case without the participation of the witness. (Pl. Br., at 24-25.) Walston, however, fails to point to the discovery of some intervening evidence or fact undermining the probable cause that supported the arrest. Walston also fails to put forth any evidence that Det. Patton acted with malice in conveying the information known to him to the prosecutor or in signing the criminal court affidavit. *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 423 (S.D.N.Y. 2002) (to survive summary judgment, a plaintiff must elicit evidence "showing . . . some deliberate act punctuated with awareness of 'conscious falsity' to establish malice."). Furthermore, the Court finds it insignificant that four months elapsed between the attack and Walston's arrest. The NYPD investigated the crime between December 1, 2012 and April 10, 2013, including repeated attempts to locate Walston before the I-Card was issued.

In sum, because the undisputed evidence demonstrates that there existed probable cause to arrest and prosecute Walston for the December 1, 2012 attack on V.N., Walston's false arrest and malicious prosecutions claims relating to Walston's April 10, 2013 arrest must be dismissed.

**B.  Walston's May 25, 2013 Arrest**

**1.  False Arrest Claim – May 25, 2013**

Walston asserts that he was falsely arrested on May 25, 2013 and prosecuted for criminal possession of a weapon. As an initial matter, the Court finds that Defendant Officer Grieco and Det. Trepka had probable cause to arrest Walston on this charge based on the information from a tipster about Walston having hidden a gun in the basement of 1029 Belmont Avenue, Officer Minardi's sighting of Walston leaving the building, and the recovery of a gun from the basement, as reported by the tipster. Walston, however, argues that probable cause is undermined by the

unlawfulness of the police's entry and search of the basement of 1029 Belmont Avenue and the seizure of the gun found hidden in a sock there. The Court disagrees.

Fourth Amendment rights are personal, and may be enforced only by persons whose own protection under the Amendment has been violated. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). To contest the validity of a search, a defendant must demonstrate that he himself exhibited an actual subjective expectation of privacy in the area searched, and that this subjective expectation is reasonable. *Smith v. Maryland*, 442 U.S. 735, 743 (1979) (*citing Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). A defendant lacks "standing" in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could be considered reasonable. *See Rakas*, 439 U.S. at 137–38. "[I]t is the established law of this Circuit that the common [areas] of multi-tenant buildings are not within an individual tenant's zone of privacy", even if they are not "accessible to the public at large." *United States v. Holland*, 755 F.2d 253, 255 (2d Cir. 1985). The expectation of privacy against warrantless searches is only violated if the searched premises is one that the defendant has the right to keep private and subject to his exclusive control. *See Rakas*, 439 U.S. at 149.

Here, Walston lacks standing to contest the search of the 1029 Belmont Avenue basement. The basement at 1029 Belmont Avenue was neither "private [nor] subject to [Walston's] exclusive control." *Id.* It was shared by all of the tenants in the building.[7] As a "common area", it lacked the same constitutional protections afforded to a person's place of residence. *Holland*, 755 F.2d at 256 (the common area rule lays down a "clearly-defined boundary line for constitutionally

---

[7] The basement was a big open area with an old bar setup, a back boiler room, and door at the back leading to the common backyard. (Defs. 56.1, at ¶ 3.) Plaintiff also admits that the basement was common property. (Pl. Br., at 14.)

permissible police action, which is readily apparent to an officer in the field."). Because the shared basement at 1029 Belmont Avenue was not private, Walston had no legitimate expectation of privacy in it and thus cannot challenge the police's search of the basement and the seizure of the gun found there.

The parties disagree over whether Officer Grieco or Officer Napolitano entered the basement and recovered the gun. This fact is immaterial for purposes of the Court's analysis. Even if Officer Grieco did not himself recover the gun or see Walston exit the basement, he was entitled to rely upon the representations of his fellow officers to arrest Walston. *Husbands v. City of New York*, 335 Fed. Appx. 124, 127 (2d Cir. 2009) ("[W]here law enforcement authorities are cooperating in an investigation . . . the knowledge of one [official] is presumed shared by all."); *Zellner*, 494 F.3d at 369 ("The existence of probable cause need not be assessed on the basis of the knowledge of a single officer."). This factual dispute does not create a "genuine issue of material fact" for trial. *United States v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982) (per curiam) (internal quotation marks and citations omitted).

### 2. Malicious Prosecution – May 25, 2013

Walston's malicious prosecution claim fails as well because he cannot show that there was any intervening fact that would negate the probable cause that existed to arrest him for criminal possession of a weapon. *Kinzer,* 316 F.3d at 44. For example, Walston produces no evidence that the police received information after his arrest that contradicted Walston's ownership or possession of the gun found in the basement of 1029 Belmont Avenue. *McDermott v. City of New York*, 94-CV-2145, 1995 WL 347041, *5 (E.D.N.Y. May 30, 1995) ("In the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest

and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie.")

Walston's malicious prosecution claim also fails because there is no evidence of malice on the part of any officer with respect to the recovery of the gun. *See Brogdon*, 200 F.Supp. 2d at 423 (dismissing malicious prosecution claim where plaintiff offered no evidence "showing . . . some deliberate act punctuated with awareness of 'conscious falsity' to establish malice").

Because there existed probable cause to arrest and prosecute Walston for gun possession based, in part, on the recovery of the gun from the 1029 Belmont Avenue basement, and because Walston lacks standing to challenge the seizure of that weapon, his claims for false arrest and malicious prosecution based on Walston's May 25, 2013 arrest must be dismissed.

### C.    Plaintiffs' July 9, 2013 Arrest

#### 1.    False Arrest Claim – July 9, 2013

Plaintiffs argue that on July 9, 2013, Defendant Officer Carrieri did not have probable cause to arrest Plaintiffs for trespass because he made no effort to find out if Plaintiffs had a lease to reside at 1029 Belmont Avenue. (Carrieri Dep., Dkt. 44-9, at 62:16 to 63:10.) This is incorrect. Although an officer cannot deliberately disregard facts known to him, he is not required to refute all defenses prior to making an arrest. *Panetta*, 460 F.3d at 395-396 ("an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."); *Lowth*, 82 F.3d at 569 (probable cause to arrest is determined based on what officer knew at time of arrest).

Here, Officer Carrieri had probable cause to arrest Plaintiffs for trespass upon finding them in the apartment at 1029 Belmont Avenue.[8]  Prior to entering the building, Officer Carrieri had been informed by fellow officers that, according to the building's owner, no one was supposed to be living in the building.  (Defs. 56.1, at ¶ 36.)  After finding Plaintiffs there, Sargent Diego Dotres called the owner, M.M., a second time to confirm that Plaintiffs were not supposed to be living at the premises, which M.M. confirmed.  (*Id.*)[9]  Based on what was known to the officers at that time, there was probable cause to believe that Plaintiffs had committed, and were committing, trespass by residing there.  *See Lowth*, 82 F.3d at 569 (probable cause to arrest is determined based on what officer knew at time of arrest).  Officer Carrieri and the other officers were not required to investigate any further or determine whether Plaintiffs had a lease for the premises.  *Panetta*, 460 F.3d at 395-396.  Indeed, based on the building owner's repeated representations to the officers, there was no reason to believe that was the case.

Plaintiffs suggest that probable cause to arrest them for trespass is negated by the fact that the police were responding to 1029 Belmont Avenue to look for the shooter of a police officer and not to make an arrest for trespass.  (Pl. Br. at 27-28).  Even assuming this is true, it is irrelevant.  Whether the police went to that location for a purpose other than arresting people for trespass violations does not negate the existence of probable cause for that arrest.  *Zellner*, 494 F.3d at 369 ("[A]n arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy

---

[8] In addition, based on the undisputed facts, Officer Carrieri did not violate the Fourth Amendment by entering and searching the 1029 Belmont Avenue apartment building.  The police had written permission from the property owner, M.M., to search the building, including the apartment in which Plaintiffs were living.

[9] Plaintiffs also challenge probable cause on the basis that the building owner's affidavit, attesting to Plaintiffs' trespass at the time of their arrests, was signed on July 15, 2013, six days after the arrest.  This fact is of little consequence.  As stated, the police had probable cause based on M.M.'s oral representations to them at the time of the search and the arrests.

information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed *any crime*." (emphasis added)).  Furthermore, the fact that Plaintiffs were arrested for simple trespass, a petty offense, does not render the arrest improper.  An officer may make an arrest for a violation, defined by New York law as a "petty offense," N.Y. Crim. Proc. Law § 1.20(39), if he reasonably believes it was committed in his presence. N.Y. Crim. Proc. Law § 140.10(1)(a)(2); *see Davis v. City of New York***,** 373 F.Supp.2d 322, 330 (S.D.N.Y. 2005) ("Although defendants did not have probable cause to arrest plaintiffs for unlawful posting or criminal trespass… probable cause existed for the lesser offense of simple trespass").

Plaintiffs further argue that Officer Carrieri involuntarily incarcerated children R.W. and P.N. in a holding cell at the 75th precinct.  At the time, Walston's son was three years old and his daughter was less than one-year old.  (Defs. 56.1, at ¶¶ 43.)  Yet, Plaintiffs have not introduced any evidence as to why this is an actionable claim or that the children were conscious of their confinement.  *Savino*, 331 F.3d at 75 (element of false arrest under New York law is that "plaintiff was conscious of the confinement").  Valentine admitted that her children did not understand what was happening.  (Defs. 56.1, at ¶ 44.)  The Court finds that this is not enough to sustain a false arrest claim.  *Sager v. Rochester Gen. Hosp.*, 647 N.Y.S.2d 408 (N.Y. Sup. Ct. 1996) (granting summary judgment on a false arrest claim where, among other things, "there was no proof that [a] five-month- old child was conscious of her confinement").  Additionally, Plaintiffs have not shown that Officer Carrieri ever saw Walston's children at 1029 Belmont Avenue or the precinct.  At her deposition, Valentine admitted that she could not identify the officer who placed the children in a cell with her for an hour.  (Defs. 56.1, at ¶ 41.)  Plaintiffs therefore cannot establish that Officer Carrieri intended to confine Walston's children.

Thus, there was probable cause to support Plaintiffs' arrest on July 29, 2013 for trespass, which warrants dismissal of their false arrest claim.

### 2. Malicious Prosecution – July 29, 2013

Plaintiffs' claim for malicious prosecution must also dismissed because Officer Carrieri had probable cause to arrest Plaintiffs and sign the criminal complaint. Officer Carrieri had information from the owner of the building, M.M., that Plaintiffs were not supposed to be living on the premises and therefore had probable cause to make the arrest for trespass and commence a criminal proceeding. When the authorities became aware of exculpatory evidence, *i.e.* Plaintiffs' lease to live at the property, they dismissed the case. *Kinzer*, 316 F.3d at 44 (probable cause continues to exist at the time of prosecution unless undermined "by the discovery of some intervening fact."). Moreover, there is no evidence of malice on the part of Officer Carrieri in conveying the information known to him to the prosecutor or in signing the criminal complaint. *Brogdon*, 200 F. Supp. 2d at 423 (to survive summary judgment, a plaintiff must elicit evidence "showing . . . some deliberate act punctuated with awareness of 'conscious falsity' to establish malice.").

Accordingly, because there was probable cause to arrest and prosecute Plaintiffs for trespass on July 29, 2013, their claims for false arrest and malicious prosecution stemming from that arrest must be dismissed.

### D. Walston's December 28, 2013 Arrest (First)

### 1. False Arrest Claim – December 28, 2013 (First)

Walston argues that his arrest and prosecution on December 28, 2013 for assault was not supported by probable cause, because Defendant Officer Miles did not investigate the victim's explanation of how she got injured. However, Officer Miles was entitled to find probable cause to

arrest Walston without conducting any further investigation. Once a police officer has a reasonable basis to believe there is probable cause to arrest, the officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Alvarado v. City of New York*, 453 Fed. Appx. 56, 58 (2d Cir. 2011).

Here, Officer Miles was responding to a detailed radio dispatch from a female 911 caller about a grey van that was being driven by a woman and about a black male passenger in the van pulling another woman into the van and assaulting her. A location for the van was also provided. Upon arriving at the location, Officer Miles observed a woman, S.H., who was screaming that she had called the police because the male in the vehicle (Walston) had been strangling her cousin (Valentine), the other adult female. (Defs. 56.1, at ¶ 64.) Valentine had visible injuries to her face that were consistent with the description of events provided by the radio dispatcher, based on the 911 call. (*Id.* at ¶¶ 67, 69.) Although Valentine told Officer Miles that a group of girls had tried to assault her (Valentine) at that location, Officer Miles was not required to credit Valentine's statement, especially given the other evidence corroborating S.H.'s account made to Officer Miles at the scene, as well as in S.H.'s 911 call; nor was Office Miles required to explore and eliminate Walston's plausible claim of innocence—*i.e.*, that Valentine's injuries came from a fight with two other women—before arresting him. *Brogdon*, 200 F.Supp.2d at 419 (probable cause "can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information"); *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) (probable cause determination does not require or allow police officers "to sit as prosecutor, judge, or jury").

Because the Court finds, as a matter of law, that Officer Miles had probable cause to arrest Walston for the assault of Valentine, Walston's false arrest claim stemming from the first December 28, 2013 arrest must be dismissed.

### 2. Malicious Prosecution – December 28, 2013 (First)

In alleging malicious prosecution, Walston argues that Officer Miles unlawfully made false statements in a criminal complaint. Walston asserts that Defendant Miles falsified business records and perjured herself by incorrectly naming Valentine as the complaining witness, instead of S.H. (*See* Miles Dep., Dkt. 41-35, at 100:20-101:24 (Officer Miles admitting that she erred by naming Valentine as the complaining witness for first December 28, 2013 arrest)). Yet notwithstanding this mistake, there is no evidence of malice on the part of Officer Miles when she signed the criminal court complaint. The prosecutor drafted the criminal court complaint, and Officer Miles did not notice the error until she was questioned about it at her deposition. (Defs. 56.1, at ¶ 76.) While Officer Miles may have been careless in reviewing the affidavit, a malicious prosecution claim may not be premised upon negligence; rather, actual malice is required. *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). Walston has shown no malice here.

### E. December 28, 2013 Arrest (Second)

### 1. False Arrest Claim – December 28, 2013 (Second)

Walston argues that there was no probable cause to arrest him for threatening S.A., the owner of the bodega gas station. Walston argues that probable cause was undermined by the fact that S.A.'s identification of Walston as the perpetrator was based on Officer Gessner showing S.A. a single photograph of Walston. Walston's argument is both factually and legally unpersuasive. Prior to Officer Gessner showing S.A. Walston's photograph, S.A. had identified Walston to both Officer Casimir (as memorialized in an open complaint report) and Officer Gessner as the person

who had threatened him.  S.A. made clear that he knew Walston from a number of prior incidents during which Walston had shoplifted at S.A.'s store and that these prior incidents were the catalyst for the threat incident on December 28, 2013.  In determining whether probable cause existed, Officer Gessner was entitled to rely on S.A.'s allegations that a threat had been made and his identification of Walston as the person who had threatened S.A.  *Miloslavsky*, 808 F.Supp. at 355 ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness"); *Singer*, 63 F.3d at 119 (officer has probable cause to effect an arrest "absent circumstances that raise doubts as to the victim's veracity").  Moreover, the showing of a single photograph to the victim, S.A., was not unduly suggestive, given S.A.'s prior identification of Walston as the perpetrator and S.A.'s familiarity with Walston.  (Defs. 56.1, at ¶¶ 82-83.)  As with V.N., when S.A. identified Walston in the photograph, he was merely confirming that Walston was the person whom he had previously identified to the police, *i.e.*, the man who regularly stole items from S.A.'s shop.  (*Id.*)  *United States v. Shodeinde*, No. 96–1512, 108 F.3d 1370 (table), 1997 WL 138701 at *3 (2d Cir. Mar. 21, 1997) (determining that witnesses had an "independent and reliable basis" to identify defendant because they had "ample opportunity to view and interact with [defendant] prior to being shown single photograph").  Furthermore, even if the single-photo identification procedure was unduly suggestive, the Court finds that it was independently reliable for the same reasons.

Walston further argues that Defendant Officer Gessner erred by not investigating and reviewing available video that allegedly depicted Walston committing the crime.  But courts in this Circuit have expressly held that police do not have to review surveillance video in order to establish probable cause.  *See*, *e.g.*, *Wieder v. City of New York*, No. 09-CV-3914 (WFK) (VVP), 2013 WL 1810751, at *10-11 (E.D.N.Y. Apr. 29, 2013) (dismissing claims of false arrest and

malicious prosecution where plaintiff claimed that officers failed to review or obtain video surveillance footage and failed to interview witnesses). Here, the police had probable cause to arrest Walston for threatening S.A. on December 13, 2013 without obtaining and reviewing the store's surveillance video recordings.

### 2. Malicious Prosecution – December 28, 2013 Arrest (Second)

As discussed, probable cause to arrest is probable cause to prosecute unless some other information becomes known to the officer prior to the prosecution that would undermine probable cause. *Kinzer*, 316 F.3d at 44. Here, Walston offers no evidence of such intervening information, nor do they offer evidence of Officer Gessner's malice.

Accordingly, because there existed probable cause to arrest and prosecute Walston for the December 13, 2013 threat incident, Walston's claims for false arrest and malicious prosecution based on his second December 28, 2013 arrest must be dismissed.

### F. Qualified Immunity

Defendants raise a defense of qualified immunity to Plaintiffs' 1983 claims. The doctrine of qualified immunity entitles public officials to freedom from suit for acts undertaken in their official capacity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Weyant*, 101 F.3d at 857. In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show "arguable" probable cause. *See Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997). "Arguable probable cause exists when 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well[-] established law." *Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (quoting *Lee*, 136 F.3d at 102).

The Court has already found that police had a legitimate defense of probable cause to negate Plaintiffs' 1983 claims in each of the five incidents. Therefore, the Court need not, and declines to, reach the merits of Defendants' qualified immunity defense, since arguable probable cause is a lower standard. *Harley v. City of New York*, 14-cv-05452 (PKC) (VMS), 2017 WL 4325815, at *6, n. 9 (E.D.N.Y. Sept. 27, 2017) ("Because the Court finds that there was probable cause to arrest Plaintiff, it need not reach the question of qualified immunity, as 'arguable probable cause' is a lower standard.").

### G. Plaintiffs' Municipal Liability Claim

Plaintiffs argue that the City failed to discipline police officers and is "responsible for its custom and practice of tacitly condoning corruption within NYPD ranks." (Pl. Br. at 36.) A plaintiff who seeks to hold a municipality liable for damages under Section 1983 must prove that the municipality was, in the language of the statute, the "person who… subject[ed], or cause[d] [him] to be subjected," to the deprivation of his constitutional rights. 42 U.S.C. § 1983. This means that an official policy or custom must be shown to be the cause of the deprivation of constitutional rights. *Monell v. New York City Dept. of Soc. Servs*., 436 U.S. 658, 694 (1978). Like any other 1983 "person," a municipality may be held liable either for violating constitutional rights itself or for causing a constitutional violation. *Id.* at 690-91; *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124-25 (2d Cir. 2004).

Where there is no underlying constitutional violation, there is no basis for a claim of municipal liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if plaintiff cannot show that her constitutional rights were violated by a City actor, then there cannot be *Monell* liability); *Leon v. City of New York,* 09-CV-8609, 2010 WL 2927440, at *5 (S.D.N.Y. July 1, 2010) (noting that "[a] municipality cannot be liable for acts by its employees which are not

constitutional violations"), *aff'd Martinez v. Muentes*, 340 Fed. Appx. 700 (2d Cir. July 27, 2009). Here, the Court has found that there is probable cause for each of the arrests and prosecutions at issue. As Plaintiffs' claims of a false arrest and malicious prosecution against the Defendant Officers must fail as a matter of law, so too must their claim for municipal liability against the City. *Harper v. City of New York*, No. 11-CV-4333 (CM), 2013 WL 432599, at *4 (S.D.N.Y. Jan. 31, 2013) (dismissing *Monell* claim against city because probable cause existed for plaintiff's arrest).

Furthermore, even if the Court were to find that Plaintiffs could establish a constitutional violation as to any of the arrests or prosecutions at issue, it would still dismiss Plaintiffs' claim against the City, based on Plaintiffs having failed to put forward any evidence of any "custom [or] practice of tacitly condoning corruption within NYPD ranks" (Pl. Br. at 36) that caused the unconstitutional conduct alleged in this case. *Monell*, 436 U.S. at 694.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted and Plaintiffs' Second Amended Complaint is dismissed in its entirety. The Clerk of Court is respectfully directed to enter judgment for Defendants and close the case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: January 10, 2018
      Brooklyn, New York